## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. **09-60295** |
| Plaintiff, | 15 U.S.C. § 78m(b)(2)(B); |
| v. | 15 U.S.C. § 78ff; |
| | 17 C.F.R. § 240.13b2-2; |
| TIMOTHY M. HUFF, | 18 U.S.C. § 1343; |
| Defendant. | 18 U.S.C. § 1348; |
| | 18 U.S.C. § 1349; |
| | 18 U.S.C. § 1350(c)(1); |
| | 26 U.S.C. § 7212(a); |
| | 18 U.S.C. § 2 |

**CR-MIDDLEBROOKS**

**MAGISTRATE JOHNSON**

FILED BY _____
2009 OCT 29 PM 3:39
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. L.
_____ D.C.

## INDICTMENT

The Grand Jury Charges:

## INTRODUCTORY PARAGRAPHS

At various times during the period covered by this Indictment:

1.     GlobeTel Communications Corporation ("GlobeTel"), which changed its name to Sanswire Corporation, was a Delaware corporation that was incorporated in July 2002, with its headquarters located in Fort Lauderdale, Florida. Prior to July 2002, GlobeTel was a wholly owned subsidiary of American Diversified Group, Inc. ("ADGI"). Until February 2007, GlobeTel's headquarters were located in Pembroke Pines, Florida.

2.     GlobeTel's stock was publicly traded and registered with the Securities and Exchange Commission ("SEC"), and GlobeTel was required to comply with federal laws, regulations, and rules governing the purchase and sale of publicly traded stock and the public reporting of information about the company. These laws, regulations, and rules are designed to protect members of the

investing public by, among other things, ensuring that a company's financial information was accurately recorded and disclosed to the public.

3.     GlobeTel's common stock was registered pursuant to Section 12(g) of Securities Exchange Act of 1934 (the "Exchange Act"). The Exchange Act is a law that regulates certain financial markets and their participants in the United States. Under the Exchange Act, GlobeTel was required to file periodic reports pursuant to Sections 13(a) and 15(d) of the Exchange Act. GlobeTel's shares traded on the Over-The-Counter Bulletin Board from 2002 to May 2005, traded on the American Stock Exchange ("AMEX") from in or about May 2005 until the AMEX de-listed the company on October 11, 2006, and were listed over-the-counter on the so-called Pink Sheets after that date.

4.     GlobeTel was required to file with the SEC quarterly reports Form 10-Q and Form 10-QSB and annual reports Form 10-K and Form 10-KSB. These reports were required to include financial statements that accurately presented the company's financial condition and results of its business operations.

5.     From 2002 to 2007, Defendant TIMOTHY M. HUFF lived in Broward County, Florida, in the Southern District of Florida. He was GlobeTel's Chief Executive Officer ("CEO") and a director from April 2002 until September 2006, when he became the company's chief technology officer. As CEO, Defendant TIMOTHY M. HUFF oversaw the operations of the entire company. Defendant TIMOTHY M. HUFF left GlobeTel in March 2007, although he continued to function as a consultant to the company.

6.     Thomas Y. Jimenez was chief financial officer ("CFO") of GlobeTel and its predecessor, ADGI, from October 1999 until April 2006, when he retired. As CFO, Thomas Y. Jimenez, a certified public accountant, oversaw all accounting functions and GlobeTel's financial

2

reporting, including financial reports included in GlobeTel's filings with the SEC. Thomas Y. Jimenez is a CPA licensed in New York, although his license has lapsed.

7.     As a publicly traded corporation, GlobeTel was required to have an independent auditor. Among other things, the function of the independent auditor was to ascertain the accuracy of the information that GlobeTel provided to, among others, the SEC and the IRS. GlobeTel's independent auditor from 2002 through 2006 was Dohan & Company ("Dohan & Co."), a Miami firm.

8.     The Internal Revenue Service ("IRS") is the nation's tax collection agency and administers the Internal Revenue Code enacted by Congress. The IRS is an agency of the United States Department of Treasury responsible for enforcing and administering the tax laws of the United States and collecting taxes owed to the United States. Forms W-2 are used to report employee compensation to the IRS. Forms 1099 are used to report non-employee compensation to the IRS.

9.     C&M Management Consulting, Inc. ("C&M") was a corporation that was used by GlobeTel corporate insiders to sell their GlobeTel stock to evade IRS and SEC reporting requirements.

10.     C&M maintained a stock brokerage account at Charles Schwab, ending in number ****2436. C&M also maintained a Citibank checking account, ending in number ****6151.

11.     GlobeTel Brazil, LLC was a nominee entity Defendant TIMOTHY M. HUFF utilized to receive and distribute the proceeds from the sale of GlobeTel stock. GlobeTel Brazil, LLC ("GlobeTel Brazil") maintained a SunTrust checking account, ending in number *********9848.

12.     Defendant TIMOTHY M. HUFF maintained a brokerage account at Raymond James, ending in number ****7878.

A.    **GLOBETEL'S TELECOMMUNICATIONS BUSINESS**

13.    Wholesale telecommunication ("telecom") companies earn money by serving as intermediaries between telephone or electronic transmission network companies and people who want to make telephone calls or other electronic transmissions. Using "switches" that are either large computer arrays or cable connections, wholesale telecom companies connect telephone calls between telephone or electronic transmission companies and their customers. These services are referred to as "termination" services. Wholesale telecom companies make a profit by charging customers a per-minute rate for termination services.

14.    In 2002, GlobeTel represented that it was involved in the business of providing telecom services, primarily involving Internet telephone services using Voice over Internet Protocol ("VoIP") equipment. VoIP equipment delivers voice communications over networks, such as the Internet or other networks. GlobeTel claimed that it provided these services on an international basis through "hubs" foreign and domestic locations. GlobeTel represented that in 2002 it had "virtual" networks serving customers in hubs around the world.

15.    GlobeTel purported to be involved in a number of businesses from 2002 to 2006, including the development of an airship to broadcast telecommunications to entire cities and the installation of $600 million in wireless networks in Russia.

16.    In its 2002 Annual Report filed with the SEC in April 2003, GlobeTel claimed that its "strategic plan" was to install a worldwide VoIP network, consisting of regional centers or "hubs" strategically located around the world.

17.    In its 2002 Annual Report, GlobeTel stated that in 2002 it had entered a service provider agreement with Trans Global Ventures, Inc., ("TGVI"), related to the operation of GlobeTel's telecom network in Brazil. GlobeTel reported that TGVI had existing telecom networks

4

in Brazil with a capacity of three million minutes per month. GlobeTel reported that beginning in July 2002, its Brazilian network was operating at or near its maximum capacity of four million minutes per month. In GlobeTel SEC filings, TGVI is sometimes referenced as part of the "Brazil network" or the "Brazil customers." The revenue GlobeTel reported from the "Brazil network" was often attributable in whole or in part to purported income from TGVI.

18.     GlobeTel also stated in its 2002 Annual Report that in June 2002 it entered into a memorandum of understanding with Qualnet Telecom, LLC ("Qualnet") for a joint venture to build a VoIP telecom network in Mexico for call termination throughout the country with a capacity of eight million minutes per month. The proposed name for the joint venture was GTCC Qualnet Mexico, LLC ("GTCC Qualnet"). GlobeTel stated that later in 2002, it agreed that Qualnet would act as a service provider for GlobeTel's VoIP telecom network in Mexico. GlobeTel reported that, because Qualnet had an established customer base in Mexico, its telecom network was operating near capacity within several weeks of being installed. In GlobeTel's SEC filings, GTCC Qualnet is sometimes referenced as part of the "Mexico network" or the "Mexico customers." The revenue GlobeTel reported from the "Mexico network" was often attributable in whole or in part to purported income from GTCC Qualnet.

## B.     THE FICTITIOUS REVENUE SCHEME

19.     Defendant TIMOTHY M. HUFF directed a fraudulent scheme to falsely inflate GlobeTel's revenue from in or about May 2002 through in or about June 2006. Defendant TIMOTHY M. HUFF was assisted in his scheme by Thomas Y. Jimenez, the former CFO of GlobeTel.

20.     The scheme involved the creation of fraudulent invoices that appeared to be worth millions of dollars and to report fictitious transactions between GlobeTel and telecom companies to

buy and sell telecom "minutes." In truth and in fact, GlobeTel never bought or sold anything under those invoices. As part of their audit of GlobeTel, Dohan & Co. requested technical documents, known as call detail records ("CDRs"), to confirm the transactions. In response to this request, Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez knowingly and willfully lied to representatives of Dohan & Co. and created fraudulent CDRs to corroborate the fraudulent invoices. Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez then furnished the fraudulent CDR's to Dohan & Co. Accounts receivable accumulated on GlobeTel's books as a result of the false invoices. Thereafter, Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez created fictitious transactions to make it appear that the accounts receivable account was being paid.

21.     In addition, Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez, together with two individuals identified as P.T., a stockbroker, and E.T., set up fraudulent transactions through which C&M, acting as nominee, purported to provide the GlobeTel corporate officers loans secured by the corporate officers' GlobeTel stock. In fact, the loans were on paper only. No such loans were made and no funds from the loans were remitted to the corporate officers. Rather than holding the stock as collateral for the purported loans, C&M sold the stock and distributed the proceeds from the sale of GlobeTel stock to the particular GlobeTel corporate officer. Some of the proceeds from these purported loans were later applied against GlobeTel's accounts receivable account. Defendant TIMOTHY M. HUFF knew that the stock serving as collateral for the purported loans would be sold and the proceeds distributed to GlobeTel's corporate officers.

22.     As a direct result of Defendant TIMOTHY M. HUFF'S participation in this scheme, GlobeTel issued periodic SEC reports, registration statements, and press releases that misled investors by materially misstating GlobeTel's financial results for the third quarter of 2002 through the end of 2004.

a.     **Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez Reported Fictitious Revenue In Order to Sell GlobeTel Stock**

23.     In or about the summer of 2002, Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez discussed the revenue that GlobeTel was generating from its telecom business. At this time, GlobeTel's foreign telecom networks, including those in Mexico and Brazil, were generating only a small amount of revenue. Defendant TIMOTHY M. HUFF was not satisfied with the revenue that was being generated by these networks and told Thomas Y. Jimenez that he wanted GlobeTel to be able to report steadily increasing revenue. Defendant TIMOTHY M. HUFF told Thomas Y. Jimenez that he had told investment bankers about the growth of GlobeTel and that the company's financial statements needed to show revenue to support the numbers that he had predicted for the investment bankers. Defendant TIMOTHY M. HUFF told Thomas Y. Jimenez that they needed to show growth and revenue to cause investors to invest money into GlobeTel.

24.     At Defendant TIMOTHY M. HUFF's direction, Thomas Y. Jimenez prepared and implemented a plan to report more fictitious revenue coming from Mexico telecom traffic than GlobeTel was actually producing and to offset it with fictitious telecom minutes.

25.     From in or about May 2002 through in or about October 2004, at or near the end of each quarter, Defendant TIMOTHY M. HUFF told Thomas Y. Jimenez the total amount of revenue that Defendant TIMOTHY M. HUFF wanted GlobeTel to report. Defendant TIMOTHY M. HUFF also identified the companies for which Thomas Y. Jimenez should create fraudulent invoices, including TGVI and GTCC Qualnet.

26.     Pursuant to Defendant TIMOTHY M. HUFF's direction to create fictitious revenue, from in or about May 2002 through in or about October 2004, Thomas Y. Jimenez randomly assigned to GlobeTel's business in TGVI and GTCC Qualnet a portion of the total fictitious revenue amount Defendant TIMOTHY M. HUFF wanted GlobeTel to report. Once Thomas Y. Jimenez had

7

determined the amount of fictitious revenue to be attributed to each company, Thomas Y. Jimenez created fraudulent documents that appeared to be letters and/or invoices ("fraudulent invoices") from GlobeTel to its customers and from vendors to GlobeTel. The fraudulent invoices generated by Thomas Y. Jimenez created the false appearance that GlobeTel was billing its customers and being billed by its vendors on a weekly basis.

27.    At the instruction of Defendant TIMOTHY M. HUFF, Thomas Y. Jimenez created fraudulent invoices relating to TGVI and GTCC Qualnet beginning in or about May 2002 through in or about October 2004. These invoices were fraudulent in that GlobeTel did not engage in the telecom purchases or sales described in the invoices.

**b.    GlobeTel Recorded False Revenue and Costs of Goods Based on the Fraudulent Invoices Created by Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez**

28.    From in or about May 2002 through in or about October 2004, Thomas Y. Jimenez made or caused to be made fraudulent entries in GlobeTel's accounting general ledger based upon the fraudulent invoices he created at Defendant TIMOTHY M. HUFF's direction.

29.    In 2002, Thomas Y. Jimenez made or caused to be made fraudulent entries in GlobeTel's general ledger falsely indicating that GlobeTel received revenue of approximately $5 million from the operation of TGVI and GTCC Qualnet. This revenue was based upon the fraudulent documents Thomas Y. Jimenez created at the direction of Defendant TIMOTHY M. HUFF.

30.    In 2003, Thomas Y. Jimenez made or caused to be made fraudulent entries in GlobeTel's general ledger falsely indicating GlobeTel received revenue of approximately $10 million from the operation of TGVI and GTCC Qualnet. This revenue was based upon the fraudulent invoices Thomas Y. Jimenez created at the direction of Defendant TIMOTHY M. HUFF.

8

31.    In 2004, Thomas Y. Jimenez made or caused to be made fraudulent entries in GlobeTel's general ledger falsely indicating GlobeTel received revenue of approximately $6.8 million from the operation of TGVI and GTCC Qualnet.  This revenue was based upon the fraudulent invoices Thomas Y. Jimenez created at the direction of Defendant TIMOTHY M. HUFF.

32.    Defendant TIMOTHY M. HUFF knew that the fraudulent invoices he directed Thomas Y. Jimenez to create would be used by GlobeTel's accountants and by GlobeTel to record revenue in the company's books and records.  Consequently, the fraudulent invoices would be incorporated into GlobeTel's reports of revenue generated by the company and relied upon by investors.

### c.    Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez Misled GlobeTel's Auditors Concerning the Fictitious Revenue

33.    From in or about May 2002, through in or about October 2004, at Defendant TIMOTHY M. HUFF's direction, Thomas Y. Jimenez provided the fraudulent invoices to GlobeTel's auditors when they requested them in connection with their reviews and audits of GlobeTel's financial statements.  Dohan & Co. relied upon the fraudulent invoices Thomas Y. Jimenez provided in conducting their review and audit of GlobeTel's financial statements.

34.    In 2003, as part of the audit of GlobeTel's 2002 annual report, Dohan & Co. requested CDRs to corroborate the invoices they had been provided relating to GlobeTel's telecom business in Brazil and Mexico.  CDRs are technical documents that record information, such as the date, length, origin and destination for each telephone call.  In this respect, a CDR is similar to a large telephone bill that documents all the telephone calls that are placed through a telecom switch.

35.    GlobeTel could not produce legitimate CDRs for the fraudulent invoices because the fraudulent invoices represented fictitious telecom traffic.  Defendant TIMOTHY M. HUFF falsely told GlobeTel's auditor that GlobeTel did not have CDRs for the requested invoices because the data would be too large for GlobeTel to retain.

36.     Defendant TIMOTHY M. HUFF knew a GlobeTel employee who had a software program that could be used to create documents that looked like actual CDRs using randomly-generated telephone numbers and other information. After the auditors requested CDRs, Defendant TIMOTHY M. HUFF directed Thomas Y. Jimenez to contact the employee and obtain a copy of the computer program so Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez could create fraudulent CDRs to support the fraudulent invoices.

37.     In or about August 2003, Thomas Y. Jimenez contacted the employee identified by Defendant TIMOTHY M. HUFF and obtained a copy of the computer program. Thomas Y. Jimenez was unable to determine how to use the computer program to create fraudulent CDRs. As a result, for a period of time in 2003, Defendant TIMOTHY M. HUFF created the fraudulent CDRs for the fraudulent invoices that Thomas Y. Jimenez had created. Sometime in 2003, Defendant TIMOTHY M. HUFF explained to Thomas Y. Jimenez how to use the CDR computer program and after that date, Thomas Y. Jimenez created fraudulent CDRs for the fraudulent invoices he created at Defendant TIMOTHY M. HUFF's direction.

38.     The fraudulent CDRs created by both Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez were provided to GlobeTel's auditor in 2003, 2004, and 2005 as documents to corroborate the fraudulent invoices that Thomas Y. Jimenez created. GlobeTel's auditors relied upon those fraudulent CDRs during their review and audit of GlobeTel's financial statements for the years 2003 and 2004.

**d.     Defendant TIMOTHY M. HUFF Instructed Thomas Y. Jimenez To Make False Entries in GlobeTel's General Ledger to Make it Appear That Customers Were Paying For the Fictitious Transactions**

39.     When revenue from the fraudulent invoices was recorded on GlobeTel's books, an equivalent amount of fictitious accounts receivable was also recorded representing money owed to

10

GlobeTel's subsidiaries by their customers. Since the revenue from the fraudulent invoices did not exist, no one ever paid the accounts receivable attributable to the fraudulent invoices and, as a result, millions of dollars of fictitious accounts receivables accumulated on GlobeTel's books each quarter.

40.    Generally Accepted Accounting Principles (GAAP) require a company to create a reserve for accounts receivable that may not be paid. Also, if accounts receivable are deemed uncollectible, GAAP require that they be written off and a charge be taken against the company's income for the amount of the bad debt. This change would reduce the company's net profit or increase its net loss.

41.    In order to avoid writing off accounts receivable attributable to the fictitious revenue from TGVI and GTCC Qualnet, Defendant TIMOTHY M. HUFF instructed Thomas Y. Jimenez to make entries in the general ledger that falsely recorded payments by customers against those accounts receivable.

42.    In or about September 2003, in furtherance of the scheme, Defendant TIMOTHY M. HUFF deposited into GlobeTel's bank account $300,000 that he received from a GlobeTel executive as an alleged investment in GlobeTel. Defendant TIMOTHY M. HUFF instructed Thomas Y. Jimenez to make an entry in the general ledger that falsely recorded the $300,000 as a payment by GlobeTel's customer in Brazil and that fraudulently reduced the company's accounts receivable.

43.    Between approximately May 2004 and February 2005, Defendant TIMOTHY M. HUFF made six wire transfers totaling approximately $980,500 into GlobeTel's bank account from a SunTrust account that he controlled. The SunTrust account was opened in the name of GlobeTel Brazil using $30,000 from GlobeTel, but was never used for business purposes. In truth and in fact, Defendant TIMOTHY M. HUFF utilized the GlobeTel Brazil account for his personal use, including, but not limited to, payments to jewelry stores and wire transactions to his bank accounts and bank

11

accounts controlled by his family members. Although the $980,500 were the proceeds of a purported stock-loan transaction entered into by Defendant TIMOTHY M. HUFF and other GlobeTel executives, Defendant TIMOTHY M. HUFF instructed Thomas Y. Jimenez to make entries in the general ledger that falsely recorded the deposits as payments by GlobeTel's customer in Brazil and reduced the company's accounts receivable. This money was not from payments by a GlobeTel customer or payments from a third-party on behalf of a GlobeTel customer. Under GAAP, it was an improper accounting entry for GlobeTel to apply the $980,500 against the accounts receivable owed by any GlobeTel customer. The transfers of money by Defendant TIMOTHY M. HUFF that were used to fraudulently reduce GlobeTel's accounts receivable were as follows:

| Date | Who Transferred | Amount Transferred |
|------|-----------------|--------------------|
| May 11, 2004 | Defendant TIMOTHY M. HUFF | $50,000 |
| July 28, 2004 | Defendant TIMOTHY M. HUFF | $55,000 |
| July 30, 2004 | Defendant TIMOTHY M. HUFF | $76,000 |
| Dec. 29, 2004 | Defendant TIMOTHY M. HUFF | $500,000 |
| Dec. 30, 2004 | Defendant TIMOTHY M. HUFF | $44,500 |
| Feb. 15, 2005 | Defendant TIMOTHY M. HUFF | $255,000 |
| **Total** | | **$980,500** |

44.     During the audits of the financial statements for 2002, 2003, and 2004, Dohan & Co. requested and relied upon management representation letters in which Defendant TIMOTHY M. HUFF certified that GlobeTel's financial statements were fairly presented in conformity with accounting principles and that material transactions had been properly recorded in the accounting records underlying the financial statements. Those letters were fraudulent because Defendant TIMOTHY M. HUFF knew that Thomas Y. Jimenez was making entries that recorded the fraudulent sales, fraudulent purchases and the fraudulent payments from customers at his direction.

     e.    **Defendant TIMOTHY M. HUFF Made False Statements by Signing Periodic SEC Statements and Registration Statements That He Knew Were False**

     1.    **Defendant TIMOTHY M. HUFF Knowingly Signed False Periodic Reports from November 2002 to June 2006**

45.    GlobeTel reported its 2002-04 financial results in periodic reports filed with the SEC for those periods. In addition, subsequent periodic reports included historical information so information about the 2002-04 transactions and financial reports were included in periodic filings (including amended filings) for 2005 and 2006.

46.    As a direct result of Defendant TIMOTHY M. HUFF's and Thomas Y. Jimenez's fraudulent scheme to create and report fictitious revenue related to TGVI and GTCC Qualnet, GlobeTel's annual reports (including amended annual reports) for 2002, 2003, 2004, and 2005, and its quarterly reports for the fiscal quarters ending September 30, 2002 through September 30, 2005, contained materially false and misleading financial statements and disclosures.

47.    The financial statements were false and misleading because they were derived from GlobeTel's general ledger, in which Thomas Y. Jimenez had made entries based on fraudulent documents and CDRs that he and Defendant TIMOTHY M. HUFF had created.

48.    As a direct result of the 2002-04 scheme to create fictitious telecom revenue and the fraudulent invoices and CDRs created by Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez, Defendant TIMOTHY M. HUFF knowingly, willfully, and materially misstated GlobeTel's revenue for specific quarters or years during fiscal years 2002 through 2004. As a result, all the transactions reported from Mexico and Brazil were fraudulent and should not have been reported. Thus, the financial statements in each filing set forth below materially overstated revenue for the period stated:

| DATE | FORM | PERIOD |
|---|---|---|
| 11/14/2002 | 10QSB | 3Q 2002 |
| 4/23/2003 | 10KSB | 2002 |
| 5/16/2003 | 10QSB | 1Q 2003 |
| 8/19/2003 | 10QSB | 2Q 2003 |
| 11/20/2003 | 10QSB | 3Q 2003 |
| | | 3Q 2002 |
| 4/27/2004 | 10KSB | 2003 |
| | | 2002 |
| 5/18/2004 | 10QSB | 1Q 2004 |
| | | 1Q 2003 |
| 8/16/2004 | 10QSB | 2Q 2004 |
| | | 2Q 2003 |
| 11/15/2004 | 10QSB | 3Q 2004 |
| | | 3Q 2003 |
| 3/31/2005 | 10KSB | 2004 |
| | | 2003 |
| 5/16/2005 | 10QSB | 1Q 2004 |
| 8/12/2005 | 10Q | 2Q 2004 |
| 11/14/2005 | 10Q | 3Q 2004 |
| 3/31/2006 | 10K | 2004 |
| | | 2003 |
| 6/9/2006 | 10KSB/A | 2004 |
| | | 2003 |
| 6/9/2006 | 10K/A | 2004 |
| | | 2003 |

      2.      **Defendant TIMOTHY M. HUFF Signed SEC Quarterly and Annual Reports from November 2002 to June 2006 That Made False Statements About GlobeTel's Business and Payments by Customers**

49.     Defendant TIMOTHY M. HUFF knowingly and willfully signed each of the periodic filings listed in paragraph 48, which also contained false statements that GlobeTel's customers in Brazil and Mexico had paid GlobeTel's vendors.

50.     Defendant TIMOTHY M. HUFF certified an annual report for fiscal year 2002 (Form 10-KSB), filed on April 23, 2003, which stated:

      a.     During 2002, the Company recognized revenue of $1,976,135 and included cost of revenues of $916,628 (substantially all of which was paid directly to third party supplies by TGVI) in connection with the Brazil network; and

      b.     During 2002, the Company recognized revenue of $3,198,502 and included in cost of revenues of $2,674,552 (substantially all of which was paid directly to third-party suppliers by Qualnet), in connection with the Mexico network.

These statements were false and misleading in that there was no payment by anyone with respect to the revenue stated in the fraudulent invoices created by Thomas Y. Jimenez at Defendant TIMOTHY M. HUFF's direction. When Defendant TIMOTHY M. HUFF signed the certifications on Form 10-KSB, he knew that the revenues listed on that form were false.

51.     Defendant TIMOTHY M. HUFF certified a quarterly report for the second quarter of 2003 (Form 10-QSB), filed on August 19, 2003, which stated:

      a.     In connection with the Mexico network, $1,371,680 and $2,577,880 during the three months and six months ended June 30, 2003, respectively, was paid by our Mexico network customer directly to a local provider of network termination services, and, accordingly, the accounts receivable due from the customer was reduced by the same amounts.

This statement was false and misleading in that there was no payment by anyone with respect to the revenue stated in the fraudulent invoices created by Thomas Y. Jimenez at Defendant

TIMOTHY M. HUFF's direction. When Defendant TIMOTHY M. HUFF signed the certifications on Form 10-KSB, he knew that the revenues listed on that form were false.

52.     Defendant TIMOTHY M. HUFF certified an annual report for fiscal year 2003 (Form 10-KSB), filed on April 27, 2004, which stated:

      a.      In connection with the Brazil network, $1,955,818 and $916,629 during years ended December 31, 2003 and 2002 respectively, was paid by our Brazilian network customer directly to a local provider of network terminations services, and, accordingly, the accounts receivable due from the customer was reduced by the same amounts; and

      b.      In connection with the Mexico network, $5,609,939 and $2,674,552 during the years ended December 31, 2003 and 2002, respectively, was paid by our Mexico network customer directly to a local provider of network termination services, and, accordingly, the accounts receivable due from the customer was reduced by the same amounts.

These statements were false and misleading in that there was no payment by anyone with respect to the revenue and stated in the fraudulent invoices created by Thomas Y. Jimenez at Defendant TIMOTHY M. HUFF's direction. When Defendant TIMOTHY M. HUFF signed the certifications on Form 10-KSB, he knew that the revenues listed on that form were false.

53.     On or about May 18, 2004, Defendant TIMOTHY M. HUFF signed a Form 10-QSB for the first quarter of 2004 certifying that GlobeTel had revenues of $3,210,333 for the quarter. Of this amount, Defendant TIMOTHY M. HUFF certified that "The Brazil and Mexico customers account for 98% of the company's accounts receivable, including 48% attributable to the Brazil network and 50% to the Mexico network," knowing that such revenues did not exist. Defendant TIMOTHY M. HUFF knowingly certified a total of approximately $3,148,126 in false revenue on the SEC Form 10-QSB for the first quarter of 2004, which represents 98% of the total revenues claimed.

54.     On or about August 16, 2004, Defendant TIMOTHY M. HUFF signed a Form 10-QSB for the second quarter of 2004 certifying that GlobeTel had revenues of $3,790,085 for the quarter. Of this amount, Defendant TIMOTHY M. HUFF certified that the "Brazil network" had generated $715,684 in revenues, knowing that such revenues did not exist. Defendant TIMOTHY M. HUFF also certified that the "Mexico network" had generated revenues of $1,674,828, although he knew that such revenues did not exist. Defendant TIMOTHY M. HUFF knowingly certified a total of $2,390,512 in false revenue on the SEC Form 10-QSB for the second quarter of 2004.

55.     On or about November 15, 2004, Defendant TIMOTHY M. HUFF signed a Form 10-QSB for the third quarter of 2004 certifying that GlobeTel had revenues of $7,509,206 for the quarter. Of this amount, Defendant TIMOTHY M. HUFF certified that the "Brazil network" had generated $651,954 in revenues, although he knew that such revenues did not exist. Defendant TIMOTHY M. HUFF also certified that the "Mexico network" had generated revenues of $1,402,078, although he knew that such revenues did not exist. Defendant TIMOTHY M. HUFF knowingly certified a total of $2,054,032 in false revenue on the SEC Form 10-QSB for the third quarter of 2004.

56.     GlobeTel's annual report for 2004 (Form 10-KSB), filed March 31, 2005, and amended annual report for 2004 (Form 10-KSB/A), filed June 9, 2006, both of which were signed by Defendant TIMOTHY M. HUFF, each stated that 36.5 percent of the company's revenue for 2004 "continued to be predominately from telecommunications minutes going through our Mexico, Philippines and Brazil networks through June 2004," that "[o]ur Mexico network generated $4,774,657 (or 16.5% of gross revenues)," and that "our Brazil network generated $2,147,119 (or 7.4% of gross revenues)." These descriptions were false because Defendant TIMOTHY M. HUFF

and Thomas Y. Jimenez had fabricated the transactions and recorded revenue based upon fraudulent documents.

57.     GlobeTel's annual report for 2005 (Form 10-K), filed on March 31, 2006, and amended annual report for 2005 (Form 10-K/A), filed June 9, 2006, both of which were signed by Defendant TIMOTHY M. HUFF, stated that the company had written off more than $1 million in accounts receivable deemed to be uncollectible in 2004 and had increased the company's allowance for doubtful accounts in 2005 by more than $1 million. Both reports stated that the substantial portion of that allowance "relates to two of these three customers" in Mexico and Brazil. However, Defendant TIMOTHY M. HUFF and GlobeTel failed to disclose that the "allowances" actually related to the fictitious transactions that were created as part of Defendant TIMOTHY M. HUFF's scheme. Further, Defendant TIMOTHY M. HUFF failed to disclose that in 2004 and 2005 he caused funds to be transferred from the GlobeTel Brazil SunTrust account to the GlobeTel account and caused those transfers to be falsely recorded in GlobeTel's general ledger as payments from a customer in Brazil. This fraudulent transfer allowed GlobeTel to fraudulently avoid larger "write-offs" or "allowances."

58.     On November 2, 2007, after Defendant TIMOTHY M. HUFF was no longer CEO of GlobeTel, the company filed a restated Form 10-KSB that reported revenue, expenses, and profits for 2004. On December 5, 2007, the company filed a restated Form 10-K for 2005 that included financial statements for 2004, which were previously fraudulently overstated.

### 3.     Defendant TIMOTHY M. HUFF Signed SEC Registration Statements from December 2002 to July 2004 that Incorporated False Statements in the Periodic Reports

59.    Between approximately May 2002 and October 2004, GlobeTel filed the following seven registration statements with the SEC, registering the sale of its common stock, that were signed by Defendant TIMOTHY M. HUFF:

| Filing | Date | CEO Who Signed the Registration Statement | Number of Shares Registered |
|--------|------|-------------------------------------------|-----------------------------|
| Form S-8 | Dec. 10, 2002 | Defendant TIMOTHY M. HUFF | 2,500,000 |
| Form SB-2 | Dec. 16, 2002 | Defendant TIMOTHY M. HUFF | 65,000,000 |
| Form S-8 | July 31, 2003 | Defendant TIMOTHY M. HUFF | 21,000,000 |
| Form S-8 | Oct. 15, 2003 | Defendant TIMOTHY M. HUFF | 5,650,000 |
| Form S-8 | Jan. 8, 2004 | Defendant TIMOTHY M. HUFF | 33,000,000 |
| Form S-8 | Feb. 17, 2004 | Defendant TIMOTHY M. HUFF | 9,100,000 |
| Form S-8 | July 22, 2004 | Defendant TIMOTHY M. HUFF | 24,666,190 |

60.    These statements reflected the sale of approximately 161 million shares of GlobeTel's common stock. All seven registration statements reported and/or incorporated by reference GlobeTel's overstated revenue and, therefore, contained materially false and misleading financial statements and disclosures.

**f.    Defendant TIMOTHY M. HUFF Caused GlobeTel to Make Materially False and Misleading Statements in Its Filings and Press Releases**

61.    Defendant TIMOTHY M. HUFF signed the periodic filings GlobeTel made and filed or caused to be filed periodic statements with the SEC from at least November 2002 through June 2006, as described in paragraph 48. Defendant TIMOTHY M. HUFF certified that these filings did

not contain any material misstatements or omit material information and that the reports fairly presented in all material respects GlobeTel's financial condition and results of operations. Defendant TIMOTHY M. HUFF knew that these certifications were materially false and misleading with respect to the descriptions of revenue related to TGVI and GTCC Qualnet. Additionally, Defendant TIMOTHY M. HUFF issued or caused to be issued at least one press release containing material misstatements or omitting material information concerning false revenue related to TGVI and GTCC Qualnet.

62.     When Defendant TIMOTHY M. HUFF signed the registration statements described in paragraph 59, he knew that they were materially false and misleading with respect to the descriptions of GlobeTel's business in Mexico and Brazil.

63.     As a direct result of the 2002-04 scheme to create fictitious telecom revenue and of Defendant TIMOTHY M. HUFF's failure to disclose that he and Thomas Y. Jimenez had created fraudulent documents and CDRs at Defendant TIMOTHY M. HUFF's direction, GlobeTel misstated its revenue during fiscal years 2002 through 2004 by millions of dollars. Consequently, GlobeTel misstated those items in its periodic filings and registration statements filed with the SEC and in press releases GlobeTel issued between November 2002 and December 2007.

64.     Defendant TIMOTHY M. HUFF knew that the invoices and CDRs that he and Thomas Y. Jimenez created were false and that the fictitious Mexican and Brazilian purchases and sales they reported to GlobeTel would be recorded in GlobeTel's books and records and incorporated into the revenue reported in GlobeTel's periodic reports, registration statements and press releases.

65.     Defendant TIMOTHY M. HUFF also knew that GlobeTel's accountants and auditors would rely upon the invoices to record the revenue and would rely upon the CDRs to confirm that

the invoices were true. The auditors requested the CDRs from Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez as part of their review and auditing procedures.

66.     In addition to its public filings, GlobeTel made materially false and misleading statements in various press releases that announced the revenue numbers discussed above. For example, GlobeTel issued a press release on or about April 23, 2003 that stated:

> GlobeTel Communications Corp. (GTEL) GTEL, with the filing of its year 2002 Form 10-KSB, announced today that the company reported record revenues of $11.69 million, up from $3.38 million, in 2001.

67.     The $11.69 million in revenue GlobeTel reported in the April 23, 2003 press release was materially overstated because it was based, in part, upon the fraudulent invoices created by Thomas Y. Jimenez at Defendant TIMOTHY M. HUFF's direction.

### g.     Defendant TIMOTHY M. HUFF Caused GlobeTel's Books and Records to Improperly Record the Company's Revenue, Accounts Receivable, and Liabilities

68.     GlobeTel's books, records, and accounts failed to properly record the company's transactions including, but not limited to, the following:

> (a)     The fraudulent invoices that Defendant TIMOTHY M. HUFF directed Thomas Y. Jimenez to create indicated that GlobeTel engaged in sales and purchases related to the Brazil and Mexico networks that did not actually occur. Defendant TIMOTHY M. HUFF created or directed Thomas Y. Jimenez to create the fraudulent invoices and CDRs and to submit them to GlobeTel's finance department knowing that they would cause GlobeTel to record revenue in its general ledger and financial statements.

> (b)     GlobeTel's general ledger falsely recorded that the accounts receivable from TGVI and GTCC Qualnet had been paid or otherwise settled and that

GlobeTel had either paid or otherwise settled its liabilities. Defendant

TIMOTHY M. HUFF made or directed the fraudulent general ledger entries.

69.     The books, records and accounts that were false include, but are not limited to, the

fraudulent invoices concerning TGVI and GTCC Qualnet, accounts in GlobeTel's general ledgers

that reflect revenue, and GlobeTel's cash flow and balance sheets that summarize the information

from the general ledgers.

70.     From 2002 to 2006, Defendant TIMOTHY M. HUFF received compensation from

GlobeTel of approximately $4.9 million and exercised stock options in 2004 and 2005 with a value

of more than $1.5 million dollars.

## STATUTORY ALLEGATIONS

### COUNT ONE
Conspiracy
18 U.S.C. § 1349

71.     The introductory paragraphs set forth above in paragraphs One (1) through Seventy

(70) above are realleged and incorporated herein by reference.

72.     Beginning on a date unknown to the Grand Jury but as early as in or around May

2002, and continuing to at least in or around June 2006, in Broward County, in the Southern District

of Florida, and elsewhere, Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez, together with

others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed with one

another, to commit the following offenses against the United States:

      (a)     false certification of financial reports, to wit: that the forms set forth in

paragraph Seventy-Four (74) that were filed with the SEC fairly presented,

in all material respects, the financial condition and results of operations of

GlobeTel, when in truth and in fact, Defendant TIMOTHY M. HUFF knew

22

the forms were false in material respects in violation of Title 18, United States Code, Section 1350(c)(1).

(b)    securities fraud, by knowingly and with the intent to defraud, devised, executed, and participated in a scheme to defraud as to material matters and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and the concealment and non-disclosure of material facts, in connection with the purchase and sale of GlobeTel stock in violation of Title 18, United States Code, Section 1348.

(c)    wire fraud, by knowingly and willfully, for the purpose of executing the above-described scheme and artifice, transmitting and causing to be transmitted by means of wire communications in interstate commerce writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

(d)    lying to GlobeTel's outside auditor, Dohan & Co., by knowingly and willfully making and causing to be made materially false and misleading statements to Dohan & Co., in connection with its audits of GlobeTel's financial statements and the preparation of the annual reports required to be filed with the SEC on Forms 10-K and Forms 10-KSB, and quarterly reports required to be filed with the SEC on Forms 10-Q and Forms 10-QSB, in violation of Title 15, United States Code, Sections 78m(b)(2)(B) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH SEVEN
Failure of Corporate Officers to Certify Financial Reports
18 U.S.C. § 1350(c)(1) and 18 U.S.C. § 2

73.     The introductory paragraphs set forth above in paragraphs One (1) through
Seventy (70) above are realleged and incorporated herein by reference.

74.     On or about the dates set forth in each of Counts Two (2) through Seven (7), set forth
below, within the Southern District of Florida and elsewhere, Defendant TIMOTHY M. HUFF and
Thomas Y. Jimenez, aiding and abetting each other, and together with others known and unknown
to the Grand Jury, falsely certified that the forms set forth below that were filed with the SEC fairly
presented, in all material respects, the financial condition and results of operations of GlobeTel,
when in truth and in fact, Defendant TIMOTHY M. HUFF knew the forms set forth below were false
and misleading in the following material respects:

| Count | Date | Form | False and Misleading Representations |
|-------|------|------|--------------------------------------|
| TWO | August 16, 2004 | 2004 Form 10-QSB | (1) 10-QSB stated that GlobeTel had revenues of $3,790,085 for the quarter; (2) 10-QSB stated that the "Brazil network" had generated $715,684 in revenues; and (3) 10-QSB stated that the "Mexico network" had generated revenues of $1,674,828. |
| THREE | November 15, 2004 | 2004 Form 10-QSB | (1) 10-QSB stated that GlobeTel had revenues of $7,509,206 for the quarter; (2) 10-QSB stated that the "Brazil network" had generated $651,954 in revenues; (3) 10-QSB stated that the "Mexico network" had generated revenues of $1,402,078; and (4) 10-QSB stated that "the remainder of our revenues continue to be predominately from telecommunications minutes going through our Mexico, Philippines and Brazil networks." |

| Count | Date | Form | False and Misleading Representations |
|-------|------|------|--------------------------------------|
| FOUR | March 31, 2005 | 2004 Form 10-KSB | (1) 10-KSB stated that 36.5% of the company's revenue for 2004 "continued to be predominately from telecommunications minutes going through our Mexico, Philippines and Brazil networks through June 2004"; (2) 10-KSB stated that "[o]ur Mexico network generated $4,774,657 (or 16.5% of gross revenues)"; and (3) 10-KSB stated that "our Brazil network generated $2,147,119 (or 7.4% of gross revenues)." |
| FIVE | March 31, 2006 | 2005 Form 10-K | (1) 10-K stated that the company had written off more than $1 million in accounts receivable deemed to be uncollectible in 2004 and had increased the company's allowance for doubtful accounts in 2005 by more than $1 million; and (2) 10-K stated that a substantial portion of that allowance "relates to two of these three customers" in Mexico and Brazil. |
| SIX | June 9, 2006 | Amended 2004 Form 10-KSB | (1) 10-KSB stated that 36.5% of the company's revenue for 2004 "continued to be predominately from telecommunications minutes going through our Mexico, Philippines and Brazil networks through June 2004"; (2) 10-KSB stated that "[o]ur Mexico network generated $4,774,657 (or 16.5% of gross revenues)"; and (3) 10-KSB stated that "our Brazil network generated $2,147,119 (or 7.4% of gross revenues)." |
| SEVEN | June 9, 2006 | Amended 2005 Form 10-K | (1) 10-K stated that the company had written off more than $1 million in accounts receivable deemed to be uncollectible in 2004 and had increased the company's allowance for doubtful accounts in 2005 by more than $1 million; and (2) 10-K stated that a substantial portion of that allowance "relates to two of these three customers" in Mexico and Brazil. |

All in violation of Title 18, United States Code, Sections 1350(c)(1) and 2.

## COUNT EIGHT
Securities Fraud
18 U.S.C. § 1348 and 18 U.S.C. § 2

75.    The introductory paragraphs set forth above in paragraphs One (1) through Seventy

(70) above are realleged and incorporated herein by reference.

76.    Beginning no later than in or about May 2002, and continuing until at least on or

about June 2006, in Broward County, in the Southern District of Florida, and elsewhere, Defendant

TIMOTHY M. HUFF and Thomas Y. Jimenez, aiding and abetting each other, and together with

others known and unknown to the Grand Jury, knowingly and with the intent to defraud, devised,

executed, and participated in a scheme to defraud as to material matters and to obtain money and

property by means of materially false and fraudulent pretenses, representations, and promises, in

connection with the purchase and sale of GlobeTel stock.

All in violation of Title 18, United States Code, Sections 1348 and 2.

## COUNTS NINE THROUGH ELEVEN
Wire Fraud
18 U.S.C. § 1343 and 18 U.S.C. § 2

77.    The introductory paragraphs set forth above in paragraphs One (1) through Seventy

(70) above are realleged and incorporated herein by reference.

78.    On or about the dates set forth below in each of Counts Nine (9) through Eleven (11),

in the Southern District of Florida and elsewhere, Defendant TIMOTHY M. HUFF, together with

others known and unknown to the Grand Jury, aiding and abetting each other, knowingly and

willfully, for the purpose of executing the above-described scheme and artifice to defraud,

transmitted and caused to be transmitted by means of wire communications in interstate commerce

writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice:

| COUNT | DATE | WIRE TRANSMITTED IN INTERSTATE COMMERCE |
|-------|------|-----------------------------------------|
| NINE | Dec. 29, 2004 | Wire transfer in the amount of $500,000 from a GlobeTel Brazil LLC account, initiated at a SunTrust Service Center, which was processed through a SunTrust Bank server in Atlanta, GA, to a GlobeTel Communications Corporation account at Commerce Bank N.A., in Coral Gables, Florida. |
| TEN | Dec. 30, 2004 | Wire transfer in the amount of $44,500 from a GlobeTel Brazil LLC account, initiated at a SunTrust Service Center, which was processed through a SunTrust Bank server in Atlanta, GA, to a GlobeTel Communications Corporation account at Commerce Bank N.A., in Coral Gables, Florida. |
| ELEVEN | Feb. 15, 2005 | Wire transfer in the amount of $255,000 from a GlobeTel Brazil LLC account, initiated at a SunTrust Service Center, which was processed through a SunTrust Bank server in Atlanta, GA, to a GlobeTel Communications Corporation account at Commerce Bank N.A., in Coral Gables, Florida. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

**COUNTS TWELVE THROUGH FIFTEEN**Lying to Accountants
15 U.S.C. §§ 78m(b)(2)(B) and 78ff;
17 C.F.R. § 240.13b2-2; and 18 U.S.C. § 2

79.     The introductory paragraphs set forth above in paragraphs One (1) through Seventy (70) above are realleged and incorporated herein by reference.

80.     On or about the dates set forth below in each of Counts Twelve (12) through Fifteen (15), in the Southern District of Florida and elsewhere, Defendant TIMOTHY M. HUFF and Thomas Y. Jimenez, together with others known and unknown to the Grand Jury, acting as officers of GlobeTel, aiding and abetting each other, knowingly and willfully, directly and indirectly, made and caused others to make the following materially false and misleading statements to Dohan & Co., and omitted to state and caused others to omit to state to Dohan & Co., material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not

27

misleading, in connection with Dohan & Co.'s review, examination, and audits of the financial statements of GlobeTel.

| Count | Date | Document | False Statement |
|-------|------|----------|-----------------|
| TWELVE | Nov. 4, 2004 | Management Representation Letter to Dohan & Co. | (1) "1. The interim financial statements referred to above have been prepared and presented in conformity with generally accepted accounting principles applicable to interim financial statements."; (2) "8. We have no knowledge of any fraud or suspected fraud affecting the company involving: (a) Management; (b) Employees who have significant roles in internal control; or (c) Others where the fraud could have a material effect on the interim financial information."; and (3) "12. There are no: a. Violations or possible violations of laws or regulations whose effects should be considered for disclosure in the interim financial statements or as a basis for recording a loss contingency." |

| Count | Date | Document | False Statement |
|-------|------|----------|-----------------|
| THIRTEEN | Mar. 19, 2005 | Management Representation Letter to Dohan & Co. | (1) "1. The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles, and include all disclosures necessary for such fair presentation and disclosures required to be included therein by the laws and regulations to which the Company is subject."; (2) "8. We have no knowledge of any fraud or suspected fraud affecting the company involving: (a) Management; (b) Employees who have significant roles in internal control, over financial reporting; or (c) Others where the fraud could have a material effect on the financial statements."; and (3) "13. There are no: a. Violations or possible violations of laws or regulations whose effects should be considered for disclosure in the financial statements or as a basis for recording a loss contingency." |

| Count | Date | Document | False Statement |
|-------|------|----------|-----------------|
| FOURTEEN | Oct. 20, 2005 | Management Representation Letter to Dohan & Co. | (1) "1. The interim financial statements referred to above have been prepared and presented in conformity with generally accepted accounting principles in the United States of America, applicable to interim financial statements and with Item 302(a) of SEC Regulation S-K. The interim financial information has been prepared on a basis consistent with prior interim periods and years and includes all disclosures necessary and required to be included by the laws and regulations to which the Company is subject."; (2) "11. We have no knowledge of any fraud or suspected fraud affecting the company involving: (a) Management; (b) Employees who have significant roles in internal control; or (c) Others where the fraud could have a material effect on the interim financial information."; and (3) "15. There are no: a. Violations or possible violations of laws or regulations whose effects should be considered for disclosure in the interim financial statements or as a basis for recording a loss contingency." |

| Count | Date | Document | False Statement |
|-------|------|----------|-----------------|
| FIFTEEN | Mar. 13, 2006 | Management Representation Letter to Dohan & Co. | (1) "1. The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles and include all disclosures necessary for such fair presentation and disclosures required to be included therein by the laws and regulations to which the Company is subject."; (2) "8. We have no knowledge of any fraud or suspected fraud affecting the company involving: (a) Management; (b) Employees who have significant roles in internal control; or (c) Others where the fraud could have a material effect on the financial statements."; and (3) "13. There are no: a. Violations or possible violations of laws or regulations whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency." |

All in violation of Title 15, United States Code, Sections 78m(b)(2)(B) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2, and Title 18 United States Code Section 2.

## COUNT SIXTEEN
Obstruct and Impede the Due Administration of the Internal Revenue Laws
26 U.S.C. § 7212(a)

81.     The allegations set forth in paragraphs One (1) through Seventy (70) of this Indictment are realleged and incorporated by reference herein.

### Statutory Allegation

82.     Beginning on or about February 9, 2003 and continuing thereafter up to at least December 31, 2005, in the Southern District of Florida and elsewhere, Defendant TIMOTHY M. HUFF did corruptly endeavor to obstruct and impede the due administration of the internal revenue laws as follows:

31

## Objects of the Offense

83.     The objects of the offense were the following:

(a)     For Defendant TIMOTHY M. HUFF to conceal his income from the Internal
Revenue Service;

(b)     For Defendant TIMOTHY M. HUFF to conceal his assets from the Internal
Revenue Service.

## Means and Methods of the Corrupt Endeavor to Obstruct and Impede

84.     Among the means and methods used by Defendant TIMOTHY M. HUFF as part of
the corrupt endeavor to obstruct and impede the Internal Revenue laws include but are not limited
to the following:

(a)     On or about February 9, 2003, Defendant TIMOTHY M. HUFF filed a 2001
U.S. Individual Income Tax Return, Form 1040, and omitted $416,000 in
income he received from ADGI.  ADGI issued Defendant TIMOTHY M.
HUFF 17.2 million shares of stock worth approximately $416,000 during
2001.

(b)     On or about October 14, 2003, Defendant TIMOTHY M. HUFF filed a 2002
U.S. Individual Income Tax Return, Form 1040, and omitted approximately
$18,748 in income he received from Infinity Capital Partners. Infinity Capital
Partners had previously issued Defendant TIMOTHY M. HUFF a Form 1099
for this income.

(c)     On or about June 16, 2004, Defendant TIMOTHY M. HUFF filed a 2003
U.S. Individual Income Tax Return, Form 1040, and omitted approximately
$44,597.81 in income he received from Infinity Capital Partners.  Infinity

32

Capital Partners had previously issued Defendant TIMOTHY M. HUFF a Form 1099 for this income.

(d)     On or about October 17, 2005, Defendant TIMOTHY M. HUFF filed a 2004 U.S. Individual Income Tax Return, Form 1040, and omitted compensation he received from GlobeTel Communications Corp. in calendar year 2004. Specifically, on or about June 4, 2004, Defendant TIMOTHY M. HUFF received 6,000,000 shares of GlobeTel stock, worth approximately $630,000, which he deposited into his Raymond James brokerage account. Defendant TIMOTHY M. HUFF subsequently transferred the 6,000,000 shares of GlobeTel stock to C&M as purported collateral for a loan. C&M sold the shares and returned the proceeds from the sale to Defendant TIMOTHY M. HUFF. Defendant TIMOTHY M. HUFF knew that this purported loan would not have to be paid back, and therefore was not a true loan. In addition, Defendant TIMOTHY M. HUFF knew that the stock serving as collateral for this purported loan would be sold and the proceeds would be distributed back to him. Defendant TIMOTHY M. HUFF filed a 2004 U.S. Individual Income Tax Return, Form 1040, which he knew substantially under-reported the amount of his taxable income by omitting the income from the fraudulent loan transaction.

    (e)      Defendant TIMOTHY M. HUFF refrained from filing a tax return for GlobeTel Brazil, LLC for the years 2003, 2004, and 2005.

All in violation of Title 26, United States Code, Section 7212(a).

                                            A TRUE BILL

By:                                 
JEFFREY SLOMAN
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

By:                                 
THOMAS P. LANIGAN
Assistant United States Attorney
Southern District of Florida

By:                                 
GREGORY R. BOCKIN
Trial Attorney
U.S. Department of Justice

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

vs.

TIMOTHY HUFF,

                     **Defendant.**
_____/

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division:** (Select One)

New Defendant(s)       Yes _____ No _____
Number of New Defendants _____
Total number of counts _____

_____ Miami    _____ Key West
__X__ FTL      _____ WPB      _____ FTP

I do hereby certify that:

1.    I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.    I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.    Interpreter: (Yes or No)      __NO__
      List language and/or dialect _____

4.    This case will take  3  ~~weeks~~ days for the parties to try.

5.    Please check appropriate category and type of offense listed below:

(Check only one)

| | | | (Check only one) | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | Petty | | _____ |
| II | 6 to 10 days | _____ | Minor | | _____ |
| III | 11 to 20 days | __X__ | Misdem. | | _____ |
| IV | 21 to 60 days | _____ | Felony | | __X__ |
| V | 61 days and over | _____ | | | |

6.    Has this case been previously filed in this District Court? (Yes or No)    __NO__
If yes:
Judge: _____    Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?    (Yes or No)    _____
If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: __08-60367-CR-Hurley - USA v. Jimenez_____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____    District of _____

Is this a potential death penalty case? (Yes or No)    __NO__

7.    Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?    _____ Yes    __X__ No

8.    Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    __X__ Yes    _____ No

_(signature)_

THOMAS P. LANIGAN
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No./Court No.: A5500033

*Penalty Sheet(s) attached

REV 4/8/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** **TIMOTHY HUFF**

**Case No**: _____

Count #: 1

 Conspiracy _____

 in violation of 18 U.S.C. § 1349 _____

**\* Max.Penalty**: Twenty (20) years' imprisonment; three (3) years' supervised release, $250,000 fine

Counts #: 2-7

 Failure of Corporate Officer to Certify Financial Reports _____

 in violation of 18 U.S.C. §1350(c)(1) and 2 _____

**\*Max. Penalty:** Ten (10) years' imprisonment; three (3) years' supervised release, $1,000,000 fine

Count #: 8

 Securities Fraud _____

 in violation of 18 U.S.C. § 1348 and 2 _____

**\*Max. Penalty:** Twenty-Five (25) years' imprisonment; three (3) years' supervised release, $250,000 fine

Counts #: 9-11

 Wire Fraud _____

 in violation of 18 U.S.C. § 1343 and 2 _____

**\*Max. Penalty:** Twenty (20) years' imprisonment; three (3) years' supervised release, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: TIMOTHY HUFF

**Case No**: _____

Counts #: 12-15

Lying to Accountants _____

in violation of 15 U.S.C. § 78m(b)(2)(B) and 78ff, 17 C.F.R. § 240.13b2-2 and 18 U.S.C. § 2

**\* Max.Penalty**: Twenty (20) years' imprisonment; three (3) years' supervised release, $5,000,000 fine

Count #: 16

Obstruct and Impede the Due Administration of the Internal Revenue Service _____

in violation of 26 U.S.C. § 7212(a) _____

**\*Max. Penalty:** Three (3) years' imprisonment; three (3) years' supervised release, $250,000 fine

Count #:

_____

_____

**\*Max. Penalty:**

Count #:

_____

_____

**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**